**The MEDIATORS, INC., Plaintiff,**

v.

**Richard MANNEY, et al., Defendants.**

**No. 93 Civ.2304(CSH)(RLE).**

United States District Court, S.D. New York.

Jan. 28, 2003.

## OPINION & ORDER

ELLIS, United States Magistrate Judge.

## I.  INTRODUCTION

On September 4, 2002, plaintiff The Mediators, Inc. ("the Mediators") and defendants Richard Manney, Gloria Manney, and Patricia Manney (collectively, "the Manneys") agreed by stipulation to proceed before this Court with what can best be described as a "binding settlement arbitration."  Pursuant to the agreement, each party was required to submit a written proposal of the terms of the settlement. They also were required to respond to each other's proposals and appear for a conference.  The Court, in turn, would select the proposal found to be most reasonable in light of the parties' submissions and comments.  The parties stipulated that they would be bound by the full terms of the proposal selected by the Court, and they would execute the final settlement agreement within forty-five days of the selection.

The Court has reviewed the written submissions of the parties and taken into account oral comments made at the December 16, 2002 conference.  For the reasons which follow, **IT IS HEREBY ORDERED THAT** the parties execute a settlement agreement including the full terms contained in the proposal submitted by the Manneys.

## II.  BACKGROUND

The Mediators and the Manneys have been involved in this litigation over the course of nearly ten years.  The action was filed on April 9, 1993, against the Manneys and various other named defendants.  The claims against the non-Manney defendants were eventually dismissed by the district court, and on November 5, 1998, the case was assigned to this Court. For approximately four years the parties have inched toward settlement.  At several points in the past, it appeared that settlement was imminent.  Unfortunately, there always seemed to be some detail which

had to be worked out. Periodically, the Court brought in the parties and helped forge a consensus. Alas, each of these agreements proved ephemeral. Finally, after myriad stops and starts, the Court informed the parties that they would settle or get ready for trial. The Court also stated that it would not participate in further settlement conferences unless the parties agreed that they would be bound by the Court's recommendation.

Prior to agreeing to the arbitration, and after many negotiation sessions, the parties had agreed that the Manneys would pay the Mediators a sum of $4,000,000 for distribution to its creditors. This sum was a fraction of the amount the Mediators asserted was due. If this amount were paid in full by the due date, the case would go away. Where the parties went astray was in trying to negotiate the terms for the contingency of the Manneys not making full payment by the agreed-upon date. They argued over such issues [1] as (1) what would happen to the proceeds if the Manneys sold one of their condominiums; (2) what amount of periodic payments would be acceptable from the Manneys; (3) what interest rate should apply to the outstanding balance; (4) under what circumstances would the Manneys be required to sell artwork and what would happen to the proceeds; (5) what would constitute a breach, and what would happen if there was a breach of the agreement.

The end result of all this haggling is that the goal line seemed always to shift. Finally, on June 18, 2002, the parties identified just two issues that remained to be resolved: (1) the creditors' request to participate in the net proceeds, or the "upside interest," of the sale of items from the Manney's collection of art, antiques, and other collectible items; and (2) the creditors' requirement that the Manneys execute a confession of judgment. Each side expressed a distrust in the other. While the Court could do little to assuage the subjective desire of the parties to feel completely protected, it informed the parties that it could assess whether their proposals were objectively reasonable, and thus proposed its "baseball arbitration." In a July 10, 2002 telephone conference with the Court, the parties agreed to proceed with the settlement arbitration to resolve the disputed issues. Rather than selecting terms from each side's proposal, the Court would select *in toto* the proposal which was most reasonable. By the stipulation signed on September 4, 2002, the Mediators and the Manneys agreed that the settlement proposal chosen by the Court would be binding.

## III. DISCUSSION

### A. Upside Interest

Both proposals include a provision entitling plaintiffs to the net proceeds from, or upside interest in, the Manneys' art sales. Settlement Proposal Submitted by the Manney Defendants ("Manney Proposal"), dated October 9, 2002, at 5; Settlement Proposal Submitted by the Official Committee of Unsecured Creditors of The Mediators, Inc. ("Mediators Proposal"), dated October 9, 2002, at 2. The purpose of the upside interest provision is that if some of the Manneys' art assets prove to have an unexpectedly high value, the creditors can capture a portion of it, while the Manneys will have enough incentive to maximize the value of their assets.[2] Mediators Proposal at 14.

---

**1.** Time and space militate against a full recitation of the disagreements which arose as this case meandered on its long and winding road to completion. This short recitation simply states a few of the more recent topics discussed with the Court.

**2.** The Mediators say that they agreed to the $4,000,000 figure, in part, because of the val-

Despite the Manneys' contention that this issue had been abandoned by the parties, they now agree that the net proceeds of sales of art collateral will be divided in the following manner: 75% will be applied as a prepayment of the settlement amount, and 25% will be retained by the Manneys. Manney Proposal at Exh. 2; Mediators Proposal at 4–5. In the event of a default, the Manneys' 25% portion will be held in escrow as additional collateral until such default is cured. Manney Proposal at Exh. 2; Mediators Proposal at 5. The proposals of both parties provide that if an item of art collateral is sold for less than its "reference amount," all of the proceeds will be applied toward prepayment of the settlement amount. *Id.* If an item of art collateral is sold in the enforcement of remedies under the settlement, "the Manneys would not be entitled to receive any of the proceeds until the entire indebtedness secured thereby ... has been satisfied." *Id.* In sum, the two proposals are virtually identical with regard to the distribution of net proceeds from the Manneys' art sales.

## B.   Confession of Judgment

### 1.   The Manneys

The parties' proposals diverge as to whether the Manneys should execute a confession of judgment of $1,000,000 in the event of a default. The Manneys argue that the confession of judgment would be punitive and unnecessary to protect the creditors. In support of this position, the Manneys contend that they have offered adequate security to the plaintiffs to assure full payment—a mortgage on their home in Pennsylvania, a first-priority security interest in their art collection, and a life insurance policy on Richard Manney.

Manney Proposal at 6. They further note that they have shown a strong commitment to pay obligations, based on the $25,000,000 paid toward their Citibank debt and the $500,000 already paid to the creditors as a settlement down payment. *Id.* The Manneys argue that the accrual of interest is a sufficient incentive to make timely payments. *Id.* Furthermore, the Manneys contend that the added pressure of a $1,000,000 confession of judgment would hinder their ability to raise funds from potential public and private sources. *Id.* at 7. Finally, they note that the parties have been aware from the beginning that Gloria Manney will not admit to any liability for what she claims are Mr. Manney's obligations to the plaintiff. *Id.*

### 2.   The Mediators

The Mediators, on the other hand, contend that the Manneys' rejection of a confession of judgment is "patently unreasonable." Response of the Mediators to the Manney Proposal ("Mediators Response") at 2. The Mediators cite finality and the avoidance of future litigation as among their highest priorities, and argue that a confession of judgment will address those objectives. *Id.* at 2–3. They contend that the Manneys' arguments are both vague and unsupported, and that Gloria Manney's obstinance is at odds with her "unconditional" agreement to enter into this arbitration for the purpose of settling the case. *Id.* at 3.

### 3.   Discussion

■ The Mediators fail to address the issue of what effect a confession of judgment may have on the Manneys' ability to procure funding. They do not dispute

uation placed on the artwork possessed by the Manneys. If the value were higher, the Mediators argue that the creditors should be placed in position to recoup more of their losses. Mediators Proposal at 14.

that it could frustrate those efforts. If the ultimate goal of the agreement is to facilitate payment by the Manneys, any provision which would affect their ability to secure funds is suspect. Further, the Mediators fail to demonstrate that a confession of judgment is indispensable to their goal of finality. Finality is best achieved by the debt being paid in a timely manner. Gloria Manney's resistance to this provision does not per se impact on the Court's determination because the Court considers each party bound by this decision. The Court notes, however, that Gloria Manney's position, no matter how legally unfounded, was well-known in this litigation, and indeed led to some innovating drafting by counsel. It is therefore a factor in evaluating the reasonableness of the proposed provision because it would necessarily create friction. A confession of judgment is a useful tool when there are serious concerns of non-compliance. Here, however, there is no evidence before the Court to support the notion that the Manneys plan not to comply.

## C. Accrual of Interest

### 1. The Manneys

The parties' proposals also differ as to the timing of the accrual of interest on the previously-negotiated $4,000,000 sum. The Manneys note that in a prior agreement made on or before March 20, 2002, and recited in a May 13, 2002 letter from the Mediators, they would have no interest obligation on the $4,000,000 settlement amount if the entire liability was discharged by June 20, 2002. Manney Proposal at 3. Alternatively, no interest would accrue on the lump sum paid by October 31, 2002, on the condition that, by June 30, 2002, the Manneys either (a) executed a contract for the sale of their home or (b) paid $1,000,000 to the creditors. *Id.* at 4. The Manneys now assert that they should

be given the same amount of time, from the date of the final settlement arbitration, within which to discharge their liability. In other words, the Manneys propose that no interest accrue if the lump sum is paid within 102 days from the final settlement date, or alternatively, they will have an additional 123 days if the conditions listed above are performed within 102 days. *Id.* The Manneys assert that these time periods are critical for permitting the Manneys to arrange for art sales and financing, and that they should be able to do so without the additional burden of interest. *Id.* Otherwise, the interest already accrued will result in an added debt burden of nearly $400,000 and quarterly payments of $500,000. *Id.*

### 2. The Mediators

Pursuant to the Mediators' proposal, the settlement amount would accrue interest beginning January 1, 2001, without any exceptions. The Mediators argue that the previously-negotiated payment dates were not time periods, but rather fixed dates that were not to be projected into the future. Mediators Response at 2. They claim the past dates were intended to avoid delay in the settlement proceedings and to give the defendants an incentive to discharge their full payment immediately. *Id.* The Mediators believe that allowing the same length of time to pay without interest is not warranted at this stage of the litigation.

### 3. Discussion

█ The Mediators have not offered sufficient reasons that the provision suggested by the Manneys is unreasonable. In the Court's view, maintaining the time periods would further the Mediators' goal of finality by encouraging timely, full payment of the debt. Moreover, the Mediators provision effectively adds pre-settle-

ment interest to the agreed amount. Rather than encouraging prompt payment, it creates additional payment obligations.

The time frames agreed to previously are the best evidence of a reasonable time frame. The Court therefore finds that the Manneys' proposal of the 102–day period and the alternate additional 123–day period is more reasonable than an accrual of interest that would add nearly $400,000 to the payment obligation.

## D. Quarterly Payments

### 1. The Parties' Positions

Pursuant to both settlement proposals, the Manneys will be required to make quarterly payments if they do not discharge their liability for the $4,000,000 lump sum. The parties further agree that 75% of the payments will apply to accrued interest and 25% to principal. However, they differ as to the amount of the payments. The Manneys note that the previously-negotiated quarterly payment amount was $250,000, and claim that this figure is the maximum they could reasonably raise on a quarterly basis. Response of the Manneys to the Mediators Proposal ("Manney Response"), dated October 22, 2002, at 3. The Mediators propose payments of $500,000, but offer no explanation for having selected this amount. The Manneys argue that ideally the agreed-upon $250,000 amount should be decreased in light of the recent decline in the art market. *Id.* at 5.

### 2. Discussion

The Court clearly conveyed to the parties that, based on discussions at the July 10, 2002 conference, they would confine their proposals to the open disputed issues. It was not anticipated that the parties would reopen and restructure portions of the settlement agreement that had not been the subject of previous disputes. The Manneys contend that the Mediators reinvented the settlement without regard to previously-agreed terms by eliminating the opportunity for the interest-free lump sum payment and by doubling the previously-negotiated quarterly payments. *Id.* at 3, note 4. The Mediators, on the other hand, assert that the Manney have approached settlement "by means of periodic re-negotiations in which the other side's prior concessions … are always taken as the starting point." Mediators Response at 2.

It appears that both sides have engaged in a bit of extemporaneous drafting, but the quarterly payments were certainly not at issue in July 2002. On that basis alone, the $500,000 figure suggested by the Mediators would be objectionable. The Court finds, however, that even if the quarterly payments were open for discussion, the Mediators have failed to justify the increase in quarterly payments from $250,000 to $500,000. While the Court is not in a position to independently rule on the Manney's ability to pay any particular amount, the best evidence it has of a reasonable amount is the number agreed to by the parties during their prior negotiations. The Manneys maintain that they are unable to pay the large amount and would be forced to default. The Court finds that the proposed quarterly payments of $500,000 are likely to hinder the goal of procuring timely payments. Accordingly, the Court finds the $250,000 quarterly payment amount to be more reasonable.

## IV. CONCLUSION

In light of the foregoing considerations regarding a confession of judgment, timing of the accrual of interest, and the amount of quarterly payments, the Court has selected the proposal of the Manneys as the more reasonable of the two. The Media-

tors' proposal appears more likely to frustrate the full, timely compliance of the Manneys with their obligation to pay. Pursuant to the settlement arbitration stipulation, the parties must prepare and implement an agreement by **March 14, 2003**, incorporating the full terms of the Manneys' proposal.